**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Skynet Corporation, d/b/a
ZeroBrokerFees.com

      v.                              Civil No. 06-cv-218-JM

Arthur Slattery, et al.

## O R D E R

Plaintiff Skynet Corporation ("Skynet") is a Massachusetts-based internet company which provides information to buyers and sellers of real estate who do not want to utilize the services or incur the costs of a real estate broker.  The information is available to the public at Skynet's website, ZeroBrokerFees.com ("ZBF").  Plaintiff contends that the New Hampshire Real Estate Practice Act, N.H. Rev. Stat. Ann. 331-A, et seq. ("REPA"), requires plaintiff to become a licensed real estate broker before it can lawfully conduct its business in New Hampshire, in violation of its First and Fourteenth Amendment rights.  In this civil rights action, brought pursuant to 42 U.S.C. § 1983, plaintiff seeks declaratory and injunctive relief against defendants, the New Hampshire Attorney General and members of the New Hampshire Real Estate Commission ("REC"), who enforce the

REPA.  Before the court are several motions and objections, including cross motions for summary judgment, which are disposed of as set forth below.

<u>Discussion</u>

**I.  Motions to Strike (document nos. 93 & 96)**

Critical to the pending summary judgment motions is a Declaratory Ruling by the REC issued on June 15, 2007 (the "DR"), which was the result of a Petition for a Declaratory Ruling filed by Assistant Attorney General David Hilts on March 21, 2007, and which was discussed at the REC's April 19, 2007, meeting.  The parties dispute the meaning of the DR, as well as its scope, in their respective arguments for summary judgment.

Defendants have filed a Motion to Strike Plaintiff's Discussion and Exhibits Related to Settlement Negotiations (document no. 93).  Specifically, defendants want stricken from the record an email dated June 21, 2007, between counsel, which sought to clarify, in the context of a stipulation the parties were negotiating at the time, the information the REC considered in issuing the DR.  <u>See</u> Pl.'s Obj. to Defs.' M. for Summ. J., Ex. 4.  Likewise, plaintiff has filed a Motion to Strike Defendants' Representations concerning the DR made in their summary judgment

motion (document no. 96).  Specifically, plaintiff contends defendants stated that the REC considered certain facts about its website and its business activities in issuing the DR which the REC, in fact, did not consider.  The DR and the documents on which it was based, including the Complaint in this action, the March 21, 2007, Petition and the minutes of the April 19, 2007, meeting, are all part of the summary judgment record and speak for themselves.  Neither the contested June 21, 2007, settlement negotiations email, nor defendants' factual representations of what the REC considered in reaching its decision, impact my analysis of the DR or the underlying documents on which it was based.

After carefully considering the arguments, defendants' motion to strike (document no. 93) is granted to the extent that the contested June 21, 2007, email shall be stricken from the record.  Plaintiff's motion to strike (document no. 96) is also granted with respect to defendants' representations of the scope of the DR.  The challenged evidence and representations are not necessary to understand the DR or to resolve the pending summary judgment motions.  The DR will be given its plain meaning, based on the document itself.

**II.   Summary Judgment Motions (document nos. 32 & 89)**

A.  Background

Plaintiff is an online classified advertising and
information service that assists people who want to sell their
homes without a real estate agent.  Plaintiff charges a fixed fee
to advertise homes on the website; however, the fee charged
correlated to the ad's features.  Sellers determine the size and
complexity of the advertisement depending on the property details
they want displayed.  The information is then accessible to the
public at no charge.  The properties in the database can be
searched using various criteria, such as location, price, and
home size.  In addition to advertising properties, the website
provides a host of related services and information, such as
basic "how-to" guidelines and mortgage calculators, neighborhood
descriptions, and links to related service providers like moving
companies, lenders, attorneys and housing inspectors.

Neither plaintiff nor any of its employees hold themselves
out as real estate agents or brokers and, in fact, the website
explicitly states:  "You sell your home.  You keep the broker
fee!"  Compl., ¶ 22.  Plaintiff does not provide advice to either
buyers or sellers and does not otherwise serve in any fiduciary

4

capacity.  Plaintiff receives no compensation from the sale of a
property.  Despite this hands-off arrangement, plaintiff's
business falls within the purview of a "broker" defined by the
following three subsections of the REPA:

> "Broker" means any person acting for another
> . . . for . . . compensation, . . . who:
>
> (d) Lists, offers, attempts or agrees to list
> real estate for sale, lease or exchange.
>
> (h) Assists or directs in the procuring of
> prospects, calculated to result in the sale,
> exchange, lease, or rental of real estate.
>
> (j) Engages in the business of charging an
> advance fee in connection with any contract
> whereby the person undertakes to promote the
> sale or lease of real estate, through its
> listing in a publication or data base issued
> for such purpose, through referral of information
> concerning such real estate to brokers, or both.

RSA 331-A:2, III (Supp. 2007).  This statutory language
encompasses plaintiff's business of promoting the sale of real
estate, by listing properties on a database that is designed to
assist or direct in the procuring of prospects to result in the
sale of real estate, for which plaintiff charges an advance fee.

   Plaintiff operates throughout the country, but lists only a
small number of New Hampshire properties because of its concern
that it would be prosecuted for violating the REPA if it were to

enter the New Hampshire market without first obtaining a real estate brokerage license.  The REPA proscribes "any person, directly or indirectly to act as a real estate broker or real estate salesperson without a license and otherwise complying with the provisions of this chapter," RSA 331–A:3, and imposes criminal penalties for doing so.  <u>See</u> RSA 331–A:34 (rendering an individual guilty of a misdemeanor and a corporation guilty of a felony for acting as a real estate broker or salesperson without a license).  The REPA exempts from its licensing requirement, however, any "newspaper or other publication of general circulation" that charges advance fees paid "solely for advertisement."  <u>See</u> RSA 331–A:2, I (defining "advance fees" to exclude advertising fees in limited situations).

Plaintiff believes its business does not fall within this exemption, because it has been unable to obtain a definitive answer from defendants as to whether the provision for a "newspaper or other publication of general circulation" would include plaintiff and, therefore, exempt it from the licensing requirement, and because other businesses have been subjected to investigation and prosecution by defendants for engaging in similar activity.  In 2006, defendants investigated plaintiff's

founders' former employer, ISoldMyHouse.com ("ISMH"), and named
Ed Williams, one of plaintiff's two founders, in that action.
<u>See</u> Pl.'s M. for Summ. J., Ex. 6 (Notice of Hearing regarding NEC
Complaint filed against ISMH to investigate unlicensed brokerage
activity); <u>see</u> <u>also</u> Pl.'s Obj. to Defs.' M. for Summ. J., Ex. 6
(Affidavit of Francis Mackay-Smith, ¶¶ 26-29).  Concerned about
being subject to similar treatment, plaintiff commenced this
action in June 2006.

On March 21, 2007, Assistant Attorney General David Hilts
filed a Petition for Declaratory Ruling with the REC which
inquired about the applicability of the REPA to plaintiff.  The
Petition was discussed at a regular REC meeting on April 19,
2007, and a Declaratory Ruling was issued on June 15, 2007
("DR").  <u>See</u> Defs.' M. for Summ. J., Ex. D (unapproved minutes
from the 4/19/07 meeting) <u>and</u> Pl.'s M. for Summ. J., Exs. 8
(petition) & 9 (DR).  In the DR, the REC found plaintiff was not
required to obtain a real estate broker license in New Hampshire,
based upon the description of its activities provided both in the
Petition and in the Complaint in this action, which was attached
to the Petition.  Despite that finding, plaintiff continues to
believe it faces a real threat of prosecution for failing to

7

obtain a real estate brokerage license.  That perceived threat is the basis for the relief sought here.

### B.  Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Navarro v. Pfizer Corp., 261 F.3d 90, 93-94 (1st Cir. 2001) (citing authority).  The burden of showing an absence of any genuine issues of material fact lies with the moving party.  See id.  The facts must be viewed in the light most favorable to the non-moving party, construing all reasonable inferences in his favor.  See Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000).  "The role of summary judgment is to pierce the boilerplate of the pleadings and provide a means for prompt disposition of cases in which no trialworthy issue exists."  Quinn v. City of Boston, 325 F.3d 18, 28 (1st Cir. 2003) (citing Suarez, 229 F.3d at 53).

On cross motions for summary judgment, as are presently before the court, the standard of review is applied to each

motion separately.  See Am. Home Assur. Co. v. AGM Marine

Contractors, 467 F.3d 810, 812 (1st Cir. 2006); see also Mandel

v. Boston Phoenix, Inc., 456 U.S. 198, 205 (1st Cir. 2006) ("The

presence of cross-motions for summary judgment neither dilutes

nor distorts this standard of review.").  Here both plaintiff and

defendants argue the record contains no genuine issue of material

fact and that judgment can be entered in favor of their

respective positions.  The matter, therefore, is appropriate for

summary disposition.  See Quinn, 325 F.3d at 28.

### C.  Arguments

Plaintiff argues that, facially and as-applied, the REPA

violates its First Amendment rights.  Defendants respond that the

REPA is constitutional, both facially and as-applied, and that

the DR moots this action.  Because mootness may eliminate this

court's jurisdiction over the matter, the initial inquiry must be

whether or not the DR moots plaintiff's challenge.

### 1.  **Jurisdiction**

Fundamental to this court's power to adjudicate claims is

that an actual case or controversy exist.  See U.S. Const., Art.

III, § 2, cl. 1; see also Allen v. Wright, 468 U.S. 737, 750-52

(1984) (discussing the prudential limits imposed on courts by

Article III).  This "case or controversy" requirement has given
rise to the doctrines of standing and mootness, among others,
which circumscribe the power of the judicial branch and ensure
that the plaintiff raises only those rights particular to himself
that are protected by the law invoked.  See id.  "The requirement
of standing [] has a core component derived directly from the
Constitution.  A plaintiff must allege personal injury fairly
traceable to the defendant's allegedly unlawful conduct and
likely to be redressed by the requested relief."  Id. at 751
(citation omitted); see also Lujan v. Defenders of Wildlife, 504
U.S. 555, 560-61 (1992) (describing elements of standing);
Ramirez v. Ramos, 438 F.3d 92, 97 (1st Cir. 2006) (explaining how
plaintiff must possess a personal stake in the litigation).

     Plaintiff clearly has standing to wage this constitutional
challenge to the REPA.  See id. at 98 (citing authority).
Plaintiff's challenge presents "a classic 'case' or 'controversy'
within the meaning of Art. III," of "the 'conflict between state
officials empowered to enforce a law and private parties subject
to prosecution under that law.'"  Id. (quoting Diamond v.
Charles, 476 U.S. 54, 64 (1986)).  It is undisputed that
plaintiff engages in a course of conduct that is protected by the

10

First Amendment and perceives a sufficient threat of prosecution to have chilled its interest in pursuing its business in New Hampshire.  These circumstances are sufficiently immediate to warrant the declaratory relief sought here.  See <u>McInnis—Misenor v. Me. Med. Ctr.</u>, 319 F.3d 63, 69 (1st Cir. 2003) (explaining "ripeness" assesses standing at the beginning of the suit).  Even if, however, a plaintiff initially had standing to bring a claim, as is the case here, "a federal court is duty bound to dismiss the claim as moot if subsequent events unfold in a manner that undermines any one of the three pillars on which constitutional standing rests:  injury in fact, causation, and redressability." <u>Ramirez</u>, 438 F.3d at 100.

Defendants bear the burden of proving plaintiff's claim is moot.  <u>Id.</u>  To meet that burden, defendants assert that the REC, in the DR, found plaintiff did not need a license to operate in New Hampshire, which eliminated any threat of injury and resolved the controversy of whether REPA applied to plaintiff.  Plaintiff counters that defendants did not fully consider its business activities when they issued the DR and, in any event, that the DR has no preclusive or binding effect, so it does not moot the controversy.  Critical to the issue of mootness is the very fact-

specific nature of the declaratory ruling inquiry.  Defendants
point to the fact-specific nature of the declaratory ruling
process to support their position that the DR is conclusive, <u>see</u>
Defs.' Mem. in Support of M. for Summ. J. at 23 (citing RSA 331-
A:28, II to demonstrate how the REPA requires the REC to
determine each case individually); plaintiff points to that same
fact-specific inquiry to argue the DR is only as good as the
particular facts considered in it, such that when the facts
change, so will the ruling.  <u>See</u> Pl.'s Mem. in Support of Obj. to
Defs.' M. for Summ. J. at 13-17 (arguing the fact specific
inquiry limits the precedential value of the ruling).  I find
plaintiff's argument, that the DR is not a binding interpretation
of the REPA, is correct, for the following reasons.

First, "[i]t is well established that the legislature may
delegate to administrative agencies the authority to promulgate
rules necessary to implement a statue."  <u>Suburban Realty, Inc. v.
Albin</u>, 131 N.H. 689, 691, 559 A.2d 1332, 1334 (1989).  Consistent
with that principle, the statutory framework at issue here
anticipates that the REC will promulgate rules to construe and
enforce the REPA, which the REC has done.  <u>See</u> <u>e.g.</u> RSA 331-A:5,
I (creating the REC "whose duty shall be to administer this

chapter"); RSA 331-A:7 (enumerating the REC's powers, including
notification of any proposed rulemaking); RSA 331-A:25 (providing
for the REC to adopt rules under New Hampshire's Administrative
Procedure Act, RSA 541-A ("APA"), relative to, among other
things, the "[c]onduct of licensed brokers and salespeople"); RSA
331-A:26, II (prohibiting conduct which violates any rules or
orders issued by the REC); see generally N.H. Code of Adm. R.,
Ch. Rea 100, et seq. ("Rea") (the REC's administrative rules).
That rules are the mechanism by which the REC applies the REPA's
provisions is further evinced by the procedures attendant to the
passing of a rule and the definition of a rule.  See e.g. Rea
201.01-201.07 (procedures for adopting rules requiring public
notice and hearings); see also RSA 541-A:1, XV (defining rule as
"each regulation, standard, or other statement of *general
applicability* adopted by an agency to (a) implement, interpret,
or make specific a statute enforced or administered by such
agency or (b) prescribe or interpret an agency policy, procedure
or practice requirement binding on persons outside the agency"
(emphasis added)).

    Second, the statutory framework of the REPA anticipates that
the REC will enforce it following detailed procedures for

disciplinary actions and issuing orders.  See e.g. RSA 331–A:7,
VI (authorizing REC to issue orders, subpoenas, statements of
charges and statements of intent to deny licenses), RSA 331–A:28–
30 (setting forth disciplinary procedures), Rea 204.01–206.02
(governing the adjudicatory process).  An "order" is "the whole
or part of an agency's final disposition of a matter, other than
a rule . . .,"  RSA 541–A:1, XI, which follows the formal
procedures outlined above for resolving alleged violations of the
REPA.  Thus, orders are issued by the REC acting in its
adjudicatory capacity.

These provisions for rules and orders do not apply to
declaratory rulings, which are distinguished in the statutory
framework governing the REPA.  Significantly, an implementing
"rule" explicitly excludes a "declaratory ruling."  See RSA 541–
A:1, XV (defining rule to "not include . . . (d) declaratory
rulings").  A declaratory ruling is defined as "an agency ruling
as to the *specific applicability* of any statutory provision or of
any rule or order of the agency."  RSA 541–A:1, V (emphasis
added).  A declaratory ruling informs the petitioner, not the
public, "as to the applicability of any provision of RSA 331–A or
of any rule or order of the commission."  Rea 201.08.  It issues

14

following the simple procedure of a petition being filed and the
matter being discussed at the next scheduled meeting of the REC,
with no further investigation, public hearing or other process
being required before the written decision is mailed to the
petitioner.  <u>See</u> Rea 201.08.  By its very terms, a declaratory
ruling is not a rule or an order, has none of the procedural
protections of a rule or an order and, consequently, does not
have the same legal effect of a rule or an order.

   Finally, any lingering doubt about the preclusive effect of
a declaratory ruling is dispelled by the undisputed facts in the
record.  Commissioner Arthur Slattery, a defendant here, stated
in his deposition that unless the factual circumstances "were
identical," which he had no knowledge of "that situation ever
happening nor [did he] expect in [his] lifetime that it would,"
the REC would not be bound by its previous declaratory rulings.
<u>See</u> Pl.'s Obj. to Defs.' M. for Summ. J., Ex. 1 (4/3/07 Slattery
Dep., at 85, 89-85 (testifying generally the REC has no policy or
practice of being bound by prior declaratory rulings decisions).
Similarly, when asked by plaintiff, defendants repeatedly stated
that they could not answer whether or not certain conduct fell
within the exemption to the licensing requirement and that each

question had to be presented to the REC as its own Petition for
Declaratory Ruling.  <u>See</u> Pl.'s Obj. to Defs.' M. for Summ. J.,
Ex. 5 (Defendants' Responses and Supplemental Responses to
Plaintiff's First Set of Requests for Admission).  By defendants'
own admission, the declaratory ruling is a very limited inquiry,
based on the specific facts immediately before the REC at that
particular time, which may or may not be expanded depending on
what specific facts subsequently arise.  This understanding is
consistent with the statutory framework governing declaratory
rulings, that they are informal, fact-specific decisions, not
binding pronouncements of the REPA.  <u>See</u> 5 Richard V. Wiebusch,
<u>New Hampshire Practice:  Civil Practice and Procedure</u>, § 64.12
(2d ed. 1998) (explaining "at a minimum, [declaratory rulings]
bind the agency not to take action against the recipient that is
inconsistent with the views therein expressed, *at least without
prior warning*." (emphasis added)).

Based on the foregoing, I conclude the DR is not binding on
the parties here and should not be given any preclusive effect.
While the DR may have resolved the specific questions presented
by the March 21, 2007, petition, it limits its conclusion to the
factual framework stated in the petition, which is not a

definitive statement that plaintiff's business is exempt from the licensing requirement, as an order or a rule would be.  Under these circumstances, plaintiff remains faced with the actual threat of an injury that would be caused by enforcement of RSA 331-A:3, (d), (h) or (j), and that can be redressed by the relief sought here.  <u>See</u> <u>Ramirez</u>, 438 U.S. at 100 (explaining the exception to the mootness doctrine for a situation which is "capable of repetition yet evades review").  Accordingly, this court retains jurisdiction over the matter.

**2.  Licensing under the REPA**

Plaintiff alleges that the REPA requires it to obtain a real estate broker's license before it can operate its business of providing real estate information, listings, and advertising services in New Hampshire, in violation of its First Amendment rights.  Plaintiff argues that it is not exempted from the licensing requirement by the provision for "newspapers and other publications of general circulation," RSA 331-A:2, I, because it is "*engaged in the business* of listing property for sale," and because reading the exemption to include plaintiff would result in the exception swallowing the rule.  <u>See</u> Pl.'s Mem. in Supp. of Obj. to Defs.' M. for Summ. J. at 10 (emphasis in original).

17

Defendants take the opposite position, specifically arguing that the exemption covers databases like plaintiff's that charge advance fees to list classified advertisements of real estate. The resolution of this dispute requires me to construe the definition of "broker" and "advance fees" set forth in the REPA, to determine whether it requires the unconstitutional licensing plaintiff contends it does.

### a.  Statutory Construction

The interpretation of a statute is a question of law.  See Chevron v. Natural Res. Defense Council, 467 U.S. 837, 842–43 (1984) (stating rules of statutory construction); Gen. Motors Corp. v. Darling's, 444 F.3d 98, 107 (1st Cir. 2006); N.H. Dep't of Envtl. Servs. v. Marino, 155 N.H. 709, 713, 928 A.2d 818, 824 (2007).  The court first examines the language of the statute and construes it consistent with its plain and ordinary meaning. Id.; see also Bourne v. Northwood Props., LLC (In re Northwood Props., LLC), 509 F.3d 15, 32 (1st Cir. 2007) (focusing on language of statute and looking to state law where state statute at issue).  The statute must be considered as a whole, "presuming that the legislature did not use 'superfluous or redundant words.'"  S. Down Rec. Ass'n v. Moran, 141 N.H. 484, 487, 686

A.2d 314, 316 (1996) (quotation omitted).  If the language is
ambiguous, however, or if there is more than one reasonable
interpretation, the court looks beyond the statute to the
legislative history to determine its intent.  See Carlisle v.
Frisbie Mem'l Hosp., 152 N.H. 762, 773, 888 A.2d 405, 417 (2005).
"'Our goal is to apply statutes in light of the legislature's
intent in enacting them, and in light of the policy sought to be
advanced by the entire statutory scheme.'"  Id.  (quoting Hughes
v. N.H. Div. of Aeronautics, 152 N.H. 30, 38-39, 871 A.2d 18, 26
(2005)).  When, as is the case here, an agency implements a
statute, the court may also consider the agency's application and
interpretation of the statute for guidance.  See Chevron, 467
U.S. at 842-43 (explaining deference to be accorded agency's
construction of its statute); WorldNet Telecomm., Inc. v. P.R.
Tel. Co., 497 F.3d 1, 5 (1st Cir. 2007) (same); see also In re
Appeal of Stanton, 147 N.H. 724, 728, 805 A.2d 419, 423 (2002)
(deferring to agency if its decision comports with the express
statutory language).

    The statutory language at issue here are the definitions of
both "broker" and "advanced fees," set forth at RSA 331-A:2, III
and RSA 331-A:2, I, respectively.  Applying the rules of

statutory construction to these terms, I find that the REPA did

not intend to regulate a business like plaintiff's, and that

plaintiff is exempt from the statute's licensing requirement.

### b.  Meaning of "Broker"

The REPA defines a broker as "any person acting for another

. . . for . . . compensation," who does any number of specific

activities, set forth in subsections (a) – (j).  <u>See</u> RSA 331–A:2,

III.  The critical language here is not the specific activities

performed, such as listing real estate for sale, RSA 331–A:2, III

(d), assisting in the procuring of prospects calculated to result

in the sale, RSA 331–A:2, III (h), or engaging in the business of

charging an advance fee in connection with any contract designed

to promote the sale of real estate by listing in a database, RSA

331–A:2, III (j), all of which plaintiff admittedly does.  The

critical phrases are "acting for another" and "for compensation,"

because unless the person does the activities while acting for

another and receiving compensation, the activities do not fall

within the definition of broker.  <u>See</u> RSA 331–A:2, III.

The plain meaning of "acting for another" is to do something

at the behest of, on behalf of, or for the benefit of someone

else.  Based simply on the ordinary meaning of "acting for

another," plaintiff may be understood as acting for sellers by
providing a medium through which they can advertise their
property for sale, which assists them in procuring buyers.  When
that language is put in the context of the statutory scheme,
however, it connotes more of an agency relationship than merely a
conduit service.  See e.g. RSA 331-A:1 (explaining the purpose of
the statute is to ensure that real estate brokers "meet and
maintain minimum standards which promote public understanding and
confidence in the business of real estate brokerage"); see also
Blackthorne Group, Inc. v. Pines of Newmarket, Inc., 150 N.H.
804, 806, 848 A.2d 725, 728 (2004) (describing the REPA as
protecting the public against broker fraud and incompetence).
The REPA "establishes a comprehensive system for regulating real
estate sales and brokerage practices."  Suburban Realty, Inc.,
131 N.H. at 692, 559 A.2d at 1334.  To that end, its focus is on
whether the broker treats the "other," for whom it is acting,
with competence and fairness.  See e.g. RSA 331-A:10, II (listing
qualifications for licensure); RSA 331-A:25-a (providing a
licensee "is bound by the duties of loyalty, obedience,
disclosure, confidentiality, reasonable care, diligence, and
accounting" whether acting as the seller's or buyer's agent or as

a disclosed dual agent); RSA 331–A:25–b, c & d (detailing duties
of agency); In re Wehringer's Case, 130 N.H. 707, 720, 547 A.2d
252, 260 (1988) (describing a real estate agent as occupying a
position of trust and confidence and owing an obligation of
undivided loyalty to the client); Crowley v. Global Realty, Inc.,
124 N.H. 814, 819, 474 A.2d 1056, 1059 (1984) (same).

     The record here readily demonstrates that plaintiff does not
conduct its business as any sort of agency arrangement with its
clientele.  The undisputed facts are that plaintiff does not
advance the interests of either the seller or buyer, other than
by facilitating the transmission of information.  Neither
plaintiff nor any of its employees hold themselves out to be real
estate brokers or agents.  Plaintiff's website clearly states:
"You sell your home.  You keep the broker fee."  Plaintiff and
its employees do not give advice about any property transactions
and do not purport to exercise judgment on behalf of either
sellers or buyers at any stage of a transaction.  Plaintiff
clearly represents itself to the public as a "For Sale By Owner"
operation, actively distancing and distinguishing itself from a
real estate broker or agent.  These characteristics demonstrate
that while plaintiff's business activities may satisfy a literal

reading of brokerage activity set forth in RSA 331-A:2, III, in realty, plaintiff does not "act for another" within the meaning of the REPA, so as to definitively qualify as a broker.

The second critical component of the definition of a broker, as highlighted above, is that the broker receive compensation for acting for another.  It is undisputed that plaintiff receives compensation for the services it provides in the form of advance fees.  While plaintiff again satisfies the literal definition of a "broker," the REPA separately defines "advance fees."  Because statutes must be read in their entirety, recognizing that the legislature did not use redundant or superfluous words, the definition of "broker" necessarily is circumscribed by the definition of "advance fees."

### c.  Meaning of Advance Fees

"'Advance fees' mean any fees charged for services, including, without limitation, any fees charged for listing, advertising, or offering for sale or lease any real property. *Advance fees shall not include fees paid solely for advertisement in a newspaper or other publication of general circulation*."  RSA 331-A:2, I (emphasis added).  Plaintiff argues the exemption is limited to newspapers and similar publications whose advertising

of real estate is only incidental to their primary purpose, and excludes businesses, like plaintiff's that are "engaged in the business of listing property for sale."  I find this reading of the REPA neither comports with its plain language nor advances its purposes.

While a "newspaper" is sufficiently familiar to be self-explanatory, the term "other publication of general circulation" is not defined.  Ascribing to these words their ordinary meaning, I find that "publication of general circulation" means a medium readily accessible to the public at large.  That construction of the exemption includes the internet, which is a medium widely and readily accessible to the public.  I reach this conclusion for several reasons.

First, the plain language of the exemption supports this reading.  The clause uses the word "or," which is a conjunction that is used to indicate alternatives or equivalents.  See Webster's Ninth New Collegiate Dictionary at 829 (1990).  Its use conveys that any equivalent to a newspaper is exempted.  The focus is on the medium; mediums that transmit information like a newspaper fall within the exemption.  The medium must, like a newspaper, be in "general circulation," which, given its ordinary

meaning, may be understood as readily available to the public, accessible to the whole population, or in the free flow of information.  The internet is a medium by which information is disseminated, that is widely accessible to the population at large and involved in the free flow of information.  I find, therefore, that it is a form of a "publication of general circulation," equivalent to a newspaper.

Second, as a practical matter, newspapers are now on the internet, rendering the mediums one and the same.  As the undisputed record demonstrates here, the classified advertisement sections of The Boston Globe and The Boston Herald newspapers are on the internet and may be used by the public to list or peruse properties for sale much like plaintiff's website.  See Pl.'s M. for Summ. J., Ex. 18 (DeSisto deposition) & Ex. 19 (Gallagher deposition).  These newspapers receive advance fees for the classified ads they post, but are exempt from regulation pursuant to RSA 331-A:2, I.  There is no logical distinction between that service and plaintiff's business, and I will not construe the exemption to reach the absurd result of exempting one form of classified advertising but not another.  See Forsalebyowner.com Corp. v. Zinneman, 347 F. Supp. 2d 868, 877 (E.D. Cal. 2004); see

also <u>Cordero-Hernandez v. Hernandez-Ballesteros</u>, 449 F.3d 240,
254 (1st Cir. 2006) (Cyr, Sr. J., dissenting) (arguing local
newspaper's posting online satisfies the mail/wire fraud
statute's interstate communication requirement); <u>D'Antonio v.
Bella Vista Assoc. (In re Bella Vista Assoc., LLC)</u>, No. 07-
18134/JHW, 2007 WL 4555891, *2 (Bkrtcy. D.N.J. Dec. 18, 2007)
(listing as alternative marketing mediums "national and regional
newspapers and real estate journals, press releases, . . . and
internet marketing").

    The similarity between the mediums means plaintiff's
argument, that the exception swallows the rule if it is construed
to include websites, applies with equal force to newspapers.  The
exemption, however, explicitly refers to newspapers, and the
legislature cannot be understood as thoughtlessly writing the
definition so that the exception swallows the rule.  Consistent
with the REPA's policy of regulating brokerage activity, the
legislature exempted from the licensing requirement certain
publicly available mediums like newspapers, because a medium
which merely transmits information cannot reasonably be
understood as "acting for another."  Including internet-based
advertising, like plaintiff's, in the exemption is consistent

26

with the statute's history and purpose.

Third, in other contexts the internet has been used as the
preferred medium to publish information, which substantiates my
reading of "publication of general circulation" to include the
internet.  See e.g. Plata v. Schwarzenegger, No. CO1-1351 THE,
2007 WL 1624495, *4 (N.D. Cal. June 4, 2007) (inviting government
bids by "posting . . . on the . . . website and publishing the
solicitation in a trade publication of general circulation and/or
an internet-based public RFP clearinghouse"); Martin v. Weiner,
No. 06CV94, 2007 WL 4232791, *3 (W.D.N.Y. Nov. 28, 2007) (finding
the "best notice practicable under the circumstances" to satisfy
Fed. R. Civ. P. 23(c)(2)'s class action notice requirement was
defendant's website).

> The issue here is whether one aspect of
> that notice, posting of the notice on the
> defendants' website pages, is a reasonable
> manner for notice.. . . The use of the
> Internet for notice to class members is novel
> and, with the State defendants' website,
> may be over inclusive in notifying the entire
> state for a regionally based class.  But this
> is the same effect of posting a notice in a
> general circulation newspaper where a number
> of readers would not be interested class members.

Id.

Finally, defendants' interpretation of the exemption

provision is consistent with the statute's plain language.  See Worldnet Telecomms. Inc., 497 F.3d at 5; In re Appeal of Stanton, 147 N.H. at 728, 805 A.2d at 423.  The DR found that plaintiff would be exempt from the licensing requirement because it "receives only an upfront fixed fee for advertisements."  Defs.' M. for Summ. J., Ex. D.  The fact that plaintiff receives other revenue for other business ventures it pursues is irrelevant to the application of the REPA in general or the exemption in particular.  The REC has consistently maintained that if a flat fee for advertisements is charged, without any provision of advice, counsel or direction to either the sellers or the buyers, then the advertisement medium would not need to be licensed.  See e.g. Id. Ex. A (8/22/06 REC meeting minutes allowing The Lacey Group to advertise without a license); Pl.'s M. for Summ. J., Ex. 16 (9/15/03 Ronci/Flanagan letter bringing internet advertising service in compliance with the REPA); cf. Defs. M. for Summ. J., Ex. B (11/15/05 REC meeting minutes  finding listing service that receives no upfront fee but earns a commission if the property sells needs to be licensed); Pl.'s Obj. to Defs.' Mot. for Summ. J., Ex 8 (12/3/02 Arnold/Cunningham letter allowing listing if "merely acts as a bulletin board for owners to post their own

28

listing" but not if "a commission or other valuable consideration" was paid).

Plaintiff's reliance on the investigation of ISMH.com is misplaced.  The complaint filed against ISMH.com alleged that the company provided advice to buyers and sellers, screened buyers before allowing access to sellers, claimed ownership of the listings, and represented to the public that is had "sold thousands of homes saving sellers millions of dollars in commissions."  <u>See</u> Pl.'s M. for Summ. J., Ex. 9.  The REC's decision to investigate ISMH.com based on this complaint is consistent with its limited application of the exemption provision to internet-based listing services that provide an advertising medium for a fixed fee but do not engage in the sales process.

Based on the foregoing, I find that plaintiff, as a "web-based publisher of real estate advertising and information," Pl.'s Mem. in Obj. to Defs.' M. for Summ. J. at 18, is exempt from the licensing requirements of the REPA, under the terms of that statute.  <u>See</u> RSA 331-A:2, I.  By charging a flat-rate fee for advertising on its internet site, plaintiff's compensation falls squarely within the provision exempting "advance fees . . .

paid solely for advertisement in a . . . publication of general

circulation." RSA 331-A:2, I.  That only advance fees received

by a "newspaper and other publications of general circulation"

would be exempt from the definition of compensation advances the

statutory purpose of regulating only those activities done by a

person "acting for another."  The medium at issue here, like a

newspaper or other publication of general circulation, simply

provides space for the advertisements to be made publicly

available.  This service cannot be understood as "acting for

another" as that term is used in the REPA, and so the advance

fees paid for that service are exempted from the statutory

definition of broker.

I find, therefore, that, based on its business activities as

represented in the record, plaintiff is not a "broker" within the

meaning of the REPA.  The advance fees plaintiff receives for the

service it provides do not constitute "compensation" for "acting

for another" as required to satisfy the definition of a broker

set forth at RSA 331-A:2, III.  This reading of the statute

comports with REPA's policy goal of protecting the public from

"fraud and incompetence at the hands of unscrupulous brokers and

salesmen,"  Corkin v. Elger Corp., 106 N.H. 522, 523, 214 A.2d

740, 741 (1965) (internal quotation omitted)), not of regulating
the advertisement of real estate.  Since plaintiff is not a
broker, it does not need to be licensed in order to operate in
New Hampshire.  <u>See</u> RSA 331-A:3.

### 3.  The First Amendment Challenge

While plaintiff mounts a full-scale constitutional attack on
the REPA, the preceding discussion obviates the need for any
constitutional analysis of it, because it does not require
plaintiff to obtain a license before it can engage in its
business operations here.  Under these circumstances, the court
should avoid rendering constitutional pronouncements.  <u>See</u> <u>Wash.</u>
<u>State Grange v. Wash. State Republican Party</u>, __ U.S. ___, 128 S.
Ct. 1184, 1191 (2008) (rejecting facial challenge to election
statute because "[e]xercising judicial restraint in a facial
challenge frees the Court . . . from unnecessary pronouncement on
constitutional issues" (internal quotation omitted)); <u>Ashwander</u>
<u>v. Tenn. Valley Auth.</u>, 297 U.S. 288, 347 (1936) (Brandeis, J.
concurring) ("'It is not the habit of the court to decide
questions of a constitutional nature unless absolutely necessary
to a decision of the case.'" (internal quotation omitted)); <u>see</u>
<u>also</u> <u>N.H. Dep't of Envtl. Servs.</u>, 155 N.H. at 714, 928 A.2d at

31

825 ("'In reviewing a statute, we presume it to be constitutional
and we will not declare it invalid except upon inescapable
grounds.'" (internal quotation omitted)).  Because plaintiff's
alleged injury has been redressed by my finding that the
exemption provision, RSA 331-A:2, I, enables plaintiff to conduct
its business here without first obtaining a real estate broker's
license, the matter has been resolved.

<u>Conclusion</u>

As explained in detail above, defendants' motion for summary
judgment (document no. 32) is granted.  As construed herein, the
REPA does not violate plaintiff's First Amendment rights either
facially or as applied.  Plaintiff's motion for summary judgment
(document no. 89) is granted in part and denied in part.
Plaintiff may obtain the injunctive relief sought to the extent
that plaintiff may operate its business in New Hampshire without
being required to obtain a real estate license under the REPA.
Plaintiff's request for declaratory relief, that the REPA is
unconstitutional, is denied.

In its complaint, plaintiff requested an award of attorneys'
fees and costs as part of the relief sought.  A hearing on
whether or not plaintiff's request should be granted and, if so,

on the amount thereof, is scheduled for Thursday, May 15, 2008, at 10:00 a.m.  Plaintiff shall file a motion and any supporting documentation with respect to its request for fees and costs by Monday, April 14, 2008.  Defendants' response is due by Monday, April 28, 2008.  If necessary, plaintiff may file a reply by Monday, May 12, 2008.

**SO ORDERED.**

James R. Muirhead
United States Magistrate Judge

Date:    March 31, 2008

cc:      Valerie J. Bayham, Esq.
         Charles G. Douglas, Esq.
         Steven M. Simpson, Esq.
         William H. Mellor, Esq.
         Jason R.L. Major, Esq.
         James W. Kennedy, Esq.

33